LINCOLN NATIONAL LIFE
INSURANCE COMPANY,
et al., Plaintiffs

v.

Margaret EVANS, Personal Representa-
tive of the Estate of Milton Haw-
kins, Jr., et al., Defendants.

Civil No. K–95–3239.

United States District Court,
D. Maryland.

Oct. 29, 1996.

As Modified on Denial of Reconsideration
Dec. 18, 1996.

Bryan D. Bolton, Derek B. Yarmis, and Funk & Bolton, P.A., Baltimore, Maryland, for Plaintiffs.

David A. Fisher, Douglas S. Sandhaus, and Sandhaus & Fisher, L.L.C., Baltimore, Maryland, for Defendants.

FRANK A. KAUFMAN, Senior District Judge.

On November 24, 1993, Patricia Hawkins ("Ms. Hawkins") set the bed in which her husband of ten years, Milton E. Hawkins, Jr. ("Mr. Hawkins") was sleeping, on fire.[1] At the time of his death, Mr. Hawkins was insured by two accidental death and dismemberment insurance policies, one from The Lincoln National Life Insurance Company ("Lincoln National") and the other from The Guardian Life Insurance Company of America ("Guardian"), who are plaintiffs in this action (the "Insurers"). Margaret Evans, as personal representative of the Estate for her son Milton E. Hawkins, Jr. (the "Estate"), asserted a claim for the proceeds under the Lincoln National and Guardian accidental death benefit policies.[2] The Insurers have refused to pay out these proceeds to the Estate or Ms. Hawkins, claiming that accidental death benefits under the respective group plans are not due, because Mr. Hawkins' death "was not accidental and independent of all other causes within the meaning of the group plan[s]." Compl., ¶¶ 14, 15. In October 1995, the Insurers filed a Complaint for Declaratory Judgment to determine the rights and other duties of the parties under the group plans. Subsequently, the Insurers filed a Motion for Summary Judgment and the Estate filed a Cross–Motion for Summary Judgment. For the reasons set forth in this Opinion, this Court will deny the Cross–Motions for Summary Judgment, and inform counsel concerning further scheduling.

## FACTS

The Hawkinses were married in February 1983. On November 24, 1993, Ms. Hawkins set fire to the bed in which her husband was sleeping, killing him. At the time of his death, Mr. Hawkins was insured by two accidental death and dismemberment insurance policies, one for $10,000 from Lincoln National and the other for $15,000 from Guardian.[3] Mr. Hawkins obtained both policies through his employer, D. Myers & Sons, Inc., pursuant to an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001 et seq.

It is undisputed that Mr. and Ms. Hawkins had violent exchanges during their marriage. In fact, the Estate concedes that "there were occasional episodes of physical violence, maybe intense at times...." (Estate's Opp. to Mot. of Insurers for Summ.J. at 40.) The last of these occasions took place on November 23, 1993. On that day, Mr. Hawkins and his wife's niece, Shannell Ricks ("Ricks"), argued and physically fought with each other until Ms. Hawkins intervened and escorted Ricks to a relative's house. In her deposition, Ms. Hawkins testified that when she returned, Mr. Hawkins fought with her, followed her around the house, struck at least twenty-five blows to her face and upper arms, and threatened to kill her before he stopped and went to sleep.

---

1. Ms. Hawkins pled guilty to voluntary manslaughter and arson and was sentenced to five years with all but two years suspended, plus five years probation.

2. Ms. Hawkins, who was named as a defendant in the Insurers' complaint, is the named beneficiary of the accidental death coverage issued by Lincoln National and Guardian. However, the Estate has established in a separate proceeding that the "Slayer's Rule" precludes her from collecting any insurance proceeds under policies held by or for her late husband in which she was the named beneficiary. See Estate's Opp. to the Mot. of Insurers for Summ.J. and Cross–Mot. of Defendant Margaret Evans, Personal Representative of the Estate of Milton Hawkins Jr. for Summ.J. at 2 n. 1 (referencing *Lincoln National Life Ins. Co. v. Margaret Evans, Personal Representative of the Estate of Milton Hawkins, Jr. and Patricia Hawkins*, District Court of Maryland for Baltimore City, No. 54653–94). Ms. Hawkins has failed to file an Answer in the within Declaratory Judgment case.

3. While both policies cover accidental dismemberment as well as accidental death, since there is no claim for accidental dismemberment benefits, for clarity's sake this Opinion will refer to the policies as "accidental death" policies.

The Insurers allege that this type of abuse was commonplace in the Hawkins marriage. As stated above, the Estate does not deny that some violence occurred, but disputes "the amount, severity, regularity and term of any physical violence that occurred during the Hawkinses' marriage." (Estate's Opp. to Mot. of Insurers for Summ.J. at 40). In support of its contention, the Estate offers the sworn affidavits of relatives of Mr. Hawkins, who generally deny seeing evidence of bruises or other signs of physical injury as well as hearing anything from Ms. Hawkins about suffering any form of physical or mental abuse at the hands of Mr. Hawkins. According to the Estate, if a pattern of brutal abuse had existed, those individuals would have seen some evidence of it.

## SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine issue of material fact and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ. Pro. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). The non-moving party is entitled to have "all reasonable inferences ... drawn in [its] favor." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir.1987). The non-movants, however, " 'may not rest upon the mere allegations or denials of [their] pleadings' but instead 'must set forth specific facts showing that there is a genuine issue for trial.' " *Felty*, 818 F.2d at 1129 (citing Fed.R.Civ.Pro. 56(e)). "Genuine issues of material fact cannot be created through mere speculation." *Klebe v. Mitre Group Health Care Plan*, 894 F.Supp. 898, 901 (D.Md.1995) (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985)).

## DISCUSSION

The most logical source of information regarding potential liability is the language of the policies themselves.[4] Indeed, in an ERISA case, the language is particularly important for "[w]hile a court should be hesitant to depart from the written terms of a contract under any circumstances, it is particularly inappropriate in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 56 (4th Cir.1992), *cert. denied*, 506 U.S. 1081, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993). Herein, the language of both policies is substantially similar.[5] The Lincoln National group coverage certificate provides benefits "for loss due to the Employee's Accidental Death.... The loss must ... be due to an accident which occurs while the Employee is insured under this Benefit." (Mem. of Law in Supp. of Insurers Mot. for Summ.J., Exhibit B). The Lincoln National certificate defines Accidental Death as the "loss of life which results directly from ... Bodily Injury." [6] "Bodily Injury" is further defined in the certificate as "injury due directly to an accident, independent of all other causes." *Id.* Likewise, Guardian's certificate of coverage provides benefits "if you suffer a covered loss due to an accident that occurs while you're insured." *Id.* A covered loss is defined as "loss of life ... [which is] the direct result of an accident which occurs while you're insured, independent of all other causes." *Id.* Thus, for the Estate to recover under either policy, Mr. Hawkins' death must have been due to an accident, independent of all other causes, which occurred while he was insured. The term "accident" is not further defined in either policy.

*Burden of Proof*

■ The Estate argues that it bears the burden of establishing a *prima facie* case and

---

4. The question of whether an insurance company is or is not liable on the happening of certain contingencies with respect to the death of an insured, is controlled by the terms and conditions of the policy. *See* 46 C.J.S. Insurance § 1170(a) (1993).

5. The parties have stipulated to the language applicable to claims for accidental death benefits under the group insurance contracts. *See* Mem.

of Law in Supp. of Insurers' Mot. for Summ.J. at 3 n. 3.

6. The other possible causes of accidental death do not apply in this case. Such causes include: "Infection caused by Bodily Injury, or infection resulting from accidental ingestion of contaminated substance; or Accidental drowning." *Id.*

that the burden of proving any defenses thereto is on the Insurers. (Estate's Mem. Pursuant to Sept. 17, 1996 Mem. to Counsel ("Estate's Mem.") at 2). The Estate argues that the *prima facie* elements it must establish are: 1) Mr. Hawkins suffered loss of life; 2) that the loss directly resulted from bodily injury; 3) that the bodily injury occurred while he was insured; and 4) that his loss of life occurred within 90 days (which the Estate points out is the shorter of the two policy deadlines) of the date of the bodily injury which caused his death.[7] According to the Estate, for the Insurers to prevail, they would have the burden of proving several things, including that Mr. Hawkins knew or should have known that Ms. Hawkins actually believed she had no choice other than to kill him. (Estate's Mem. at 3.)[8] The Insurers agree that the Estate bears the burden of establishing a *prima facie* case, and that they would then bear the burden of proving coverage defenses, if any. (Insurers' Response to Estate's Mem. ("Insurers' Response") at 2.) However, the Insurers' argue that whether Mr. Hawkins's death was accidental under the federal common law of ERISA is an element of the Estate's *prima facie* case, not a defense by the Insurers to coverage.

The language in the policies appears to support the Insurers view. Under the Lincoln National policy, benefits are available for "loss due to the Employee's Accidental Death ... The loss must ... be due to an accident which occurs while the Employee is insured under this Benefit." Accidental death is defined as "loss of life which results directly from ... Bodily Injury" which is itself defined as "injury due directly to an accident independent of all other causes." Under Guardian's policy, the insured receives benefits if he "suffer[s] a covered loss due to an accident that occurs while ... insured." Covered loss is defined as loss of life which is "the direct result of an accident which occurs while ... insured, independent of all other causes."

ERISA requires giving "[s]traight-forward [plan] language" its "plain meaning." *See Motley v. Metropolitan Life Ins. Co.*, 834 F.Supp. 1272, 1276 (D.Kan.1993). Both ERISA and Maryland case law support placing the burden of proving that death was a result of accidental bodily injuries upon the claimant. *See id.* at 1276; *Metropolitan Life Ins. Co. v. Neikirk*, 175 Md. 163, 170–71, 200 A. 370 (1938) ("The fact of death does not of itself create a presumption that it occurred from accident, and, in the case before us, the burden rests upon the [claimant], in the first instance ... to make out a *prima facie* case in favor of recovery, by showing that the death of the insured did occur under the circumstances set forth in the policy as a condition precedent to the liability of the insurer.") In light of all those factors, in subsequent proceedings in this case, the Estate will be required to shoulder the burden of proving Mr. Hawkins death was accidental.

*When is Death Accidental*

■ There is no dispute that Mr. Hawkins obtained both the Lincoln National and Guardian accidental death policies pursuant to an employee welfare benefit plan governed by ERISA. The Supreme Court has held

---

7. What the Estate fails to clarify is (1) that bodily injury is defined under the Lincoln National policy as injury due directly to an accident, independent of all other causes and (2) that loss of life under the Guardian's policy means a loss of life which is the direct result of an accident, independent of all other causes. However, the Estate does concede, in its most recent filing that as part of its *prima facie* case, "the Estate clearly does have to produce facts concerning the circumstances of the insured's death, which facts must be sufficient to establish that his death was accidental." (Estate's Reply to Insurers' Response at 4 n. 5.)

8. Specifically, the Estate contends that the Insurers would have to prove (a) Mr. Hawkins brutally

beat Ms. Hawkins, (b) such beatings occurred with the frequency, regularity and ferocity alleged by the Insurers, (c) that as a result of these beatings, Ms. Hawkins actually believed she had no choice other than to kill Mr. Hawkins, and (d) that Mr. Hawkins "knew or should have known" that Ms. Hawkins actually believed she had no choice other than to kill him. Moreover, the Estate also contends that Insurers bear the burden of proving that (e) Ms. Hawkins suffered from Battered Spouse Syndrome, (f) Mr. Hawkins knew or should have known that she suffered from it and (g) Mr. Hawkins knew or should have known his death was going to occur on November 23, 1996. (Estate's Mem. at 3 n. 3).

that benefit provisions of a group life insurance program governed by ERISA must be interpreted under federal substantive law. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56–57, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987); *Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077, 1084 (1st Cir.1990), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990). However, in developing the federal common law of insurance benefits, courts are encouraged to refer to and be guided by state law principles when appropriate. *See Wickman,* 908 F.2d at 1084; *Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 385–86 (9th Cir. 1994); *Southern Farm Bureau Life Ins. Co. v. Moore,* 993 F.2d 98, 102 (5th Cir.1993) (look to general principles of common law or state law if ERISA provides no guidance). Since both policies were issued to Mr. Hawkins in Maryland, Maryland law is the most relevant, although the limited number of Maryland decisions addressing this issue requires looking to the case law of other states, as well. *See e.g., Aliff v. Travelers Ins. Co.,* 734 F.Supp. 232 (W.D.Va.1990) (looking to Virginia law in an ERISA case to determine whether death was accidental).

■ In *Wickman,* the Court of Appeals for the First Circuit surveyed state judicial interpretations of "accidental" in an effort to develop federal common law dealing with ERISA, noting that "[d]efining accident has troubled the state and federal judiciaries for years." *Wickman,* 908 F.2d 1077, 1085–86 (1st Cir.1990). According to Judge Rosenn of the Third Circuit, sitting by designation, "[c]ase law is fairly consistent in defining an accident, using equally ambiguous terms such as undesigned, unintentional, and unexpected." *Id.* at 1087. While it may seem counter-intuitive, in the case of an intentional homicide, the common law has "prescrib[ed] that these terms should be judged from the viewpoint of the insured," not that of the killer. *Id.* at 1087; *Republic v. Heyward,* 536 S.W.2d 549, 552 (Tex.1976) ("The test of whether the killing is accidental within the terms of an insurance policy is not to be determined from the viewpoint of the one who does the killing, but rather from the viewpoint of the insured.") (quoting *Hutcherson v. Sovereign Camp,* 112 Tex. 551, 251

S.W. 491 (1923)). "The majority of courts do not perceive the slaying through the eyes of the murderer, which would undoubtedly reflect a wilful, deliberate, calculated act rather than an accident. Instead they see the killing from the viewpoint of the victim to whom, absent misconduct from which he or she should have reasonably anticipated that he or she would be killed, the murder is unforeseen, unexpected and accidental within the terms of the insurance policy." *Lamb v. Northwestern Nat'l Life Ins. Co.,* 56 Md.App. 125, 130, 467 A.2d 182 (1983). Thus, the necessary inquiry in the within case focuses on what Mr. Hawkins' viewpoint was of the act which caused his death.

*The Expectation of the Insured Test*

■ In *Wickman,* Judge Rosenn set forth a test, combining subjective and objective elements, to be applied when determining whether an insured's death was accidental. *Wickman,* 908 F.2d at 1088–89. The first step is to determine if the insured actually expected an injury similar in type or kind to that suffered. *Id.* at 1088. If the fact-finder determines that the insured did not, or finds the evidence insufficient accurately to determine the insured's subjective expectation, then the second step calls for the fact-finder to engage in an objective analysis of the insured's expectations. *Id.* In *Wickman,* the objective component of the test was phrased in the context of "whether a reasonable person, with background and characteristics similar to the insured, *would* have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *Id.* at 1088 (emphasis added). *See also Hutcherson v. Sovereign Camp,* 112 Tex. 551, 251 S.W. 491, 493 (1923) (holding based on stipulated facts that for a killing to be non-accidental, it must be established that the insured's conduct was "such that he must have known, or at least must have anticipated, that by his conduct toward the beneficiary she would in all probability kill him").

Variations of the *Wickman* approach have been applied in several ERISA cases involving the issue of accidental death, as the parties have indicated.

In *Pierre v. Connecticut General Life Ins. Co*, 932 F.2d 1552 (5th Cir.1991), *cert. denied*, 502 U.S. 973, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991), a widow sued for benefits after her husband was killed by his lover during an altercation. The court in *Pierre*, evaluating facts stipulated to by the parties, upheld an ERISA plan administrator's denial of benefits, noting that the insured was the aggressor in the altercation and thus his actions precipitated the shooting which killed him. *Id.* at 1554. Given his status as the aggressor, the court upheld the conclusion that his death did not result " 'directly and from no other causes, from bodily injuries caused by accident' " as required by the insurance policy language. In the within case, it may perhaps be significant to the fact-finder that the insured in *Pierre*, unlike Mr. Hawkins, was killed during a physical struggle with his killer, whom he knew carried a gun.

In *Motley v. Metropolitan Life Ins. Co.*, 834 F.Supp. 1272 (D.Kan.1993), the court upheld summary judgment for the insurer where the insured, holding a gun in his hand, consciously provoked police officers to shoot him while holding his girlfriend hostage. *Id.* at 1278. Mr. Motley was ordered by the officers to drop his gun, he refused, and he was subsequently killed by them. The court in *Motley* found as a matter of law that consciously provoking a police officer to shoot oneself to death is not an accidental death. *Id.* at 1278. As is further explained below, a reasonable man in Mr. Hawkins's situation case, under the evidence presented thus far, may or may not have anticipated death or serious injury. That determination, is therefore one for the fact-finder.

In *Wickman*, the insured's death was an apparent suicide, and thus not found to be indisputably accidental because once the insured intentionally climbed over a guardrail and hung by one hand over a railroad tracks forty feet below, serious bodily injury was substantially certain. *Id.* at 1083–84. Whether or not reasonable expectations of injury in having a violent disagreement with one's unarmed wife and dangling by one hand above railroad tracks are comparable is a matter for the fact-finder to resolve.[9]

*Pierre, Motley* and *Wickman* all involved ERISA. However, under one or more applications of state law there is a similar approach. "[A]n insured may not voluntarily assume the risk of that which it is apparent or should be apparent to him, acting as a reasonable man, *would* result in injury or death." *Norris v. New York Life Ins. Co.*, 49 F.2d 62, 63 (4th Cir.1931) (emphasis added). In *Norris*, the Fourth Circuit, applying applicable state law, considered the question of whether the insured's death was accidental when the insured was shot and killed while trying to dissuade his intoxicated brother from shooting another man. Judge Northcott reversed a directed verdict for the insurance company, concluding that "there was sufficient evidence to take the case to the jury ... a reasonable man may not anticipate or foresee that his brother *would* shoot him, and such an act on the part of one's own brother is contrary to all preconceived ideas upon which reasonable men act." *Id.* at 64 (emphasis added). Thus, under that approach, Mr. Hawkins' death may not have been accidental if it was or should have been apparent to him, acting as a reasonable man, that his actions would result in injury or death. The difference between the *Wickman* and the *Norris* approaches is a matter of degree. Both apply a reasonable person standard in evaluating the insured's conduct as it relates to his injury. The difference seems to be in the language relating to probability of injury. Under the first view of the

---

9. A fourth case discussed by the parties, does not involve ERISA, but rather, Texas law. In *Guillory v. Aetna Life Ins. Co.*, 541 S.W.2d 883 (Tex.Civ. App.1976), an intermediate appellate court in Texas applied a looser application of the *Hutcherson/Wickman* test: should the insured have reasonably anticipated his killer "might" react as she did? Applying this test, the court affirmed judgment notwithstanding verdict for the insurer, concluding that when the insured attempted to force his way into the back door of his estranged wife's house, which was located in a dangerous neighborhood, at two o'clock in the morning, he should have reasonably anticipated that she might react as she did. Although there are a few cases in which courts have framed the reasonable expectation test using the "might" standard, the majority seemingly do not, but rather use the word "would" instead of "might," or adopt the "highly likely" view discussed in the body of this Opinion.

law, for a death to be non-accidental, the injury must be viewed as "highly likely to occur" whereas under the second view of the law, it either was or should have been apparent that the insured's actions "would" result in injury or death. This Court, while noting that distinction, will apply the first, (*i.e.* the federal common law) approach set forth in *Wickman* as the latter would appear slightly more consistent with the governing principles of ERISA actions.

*Applying the Wickman Test to Mr. Hawkins*

■ The first step of the *Wickman* test is to determine, if possible, whether the insured actually expected an injury similar to that suffered. As the Insurers concede, "there is no direct evidence to suggest that Mr. Hawkins actually expected to be seriously injured or killed by Ms. Hawkins." (Mem. of Law in Supp. of Insurers' Mot. for Summ.J. at 17).

Accordingly, we take the second step of the *Wickman* analysis, and perform an objective analysis of his expectations, that is, whether a reasonable person, with background and characteristics similar to Mr. Hawkins, would have viewed the injury as highly likely to occur as a result of his intentional conduct.

As a preliminary matter to determining what Mr. Hawkins' intentional conduct was and what was his expectation, the Insurers argue that years of physical and emotional abuse, numerous death threats and a "savage attack" on Ms. Hawkins in the hours before his death provide the framework within which to view his conduct. The Estate, on the other hand, contends that since "Mr. Hawkins was asleep *at the time he was killed,* all other alleged facts concerning the nature of the Hawkinses' relationship are irrelevant or unnecessary to the resolution of this case." (Estate's Mem. of Law in Opp. to the Mot. for Summ.J. at 7.) In this Court's view, the relevant time period begins prior to the time at which Mr. Hawkins fell asleep and includes the course of conduct leading up to his death.[10] That view is consistent with

the approach outlined in *Hutcherson,* in which the court evaluated the insured's conduct "at the time he was killed, coupled with his conduct just prior to such time." *Id.* at 494. This Court will expand upon Hutcherson's "just prior" approach and conclude that the fact-finder must consider the nature of the Hawkins' entire relationship. *See* 49 A.L.R.3d 673 § 4 (1973 and 1996 Supp.) ("In determining whether the insured may be said to have foreseen or anticipated his death or injury, the courts have examined the background relations between the insured and his assailant.")

Taking all that into account, the fact-finder could consider whether Mr. Hawkins fought with Ricks and Ms. Hawkins, striking the latter many times and threatening to kill her, then either stopped the fight and passed out or went to sleep without passing out. In addition, the fact-finder may also consider the history of prior violence in the relationship, and whether or not such violence included a pattern of brutal beatings, and several possibly violent episodes.

Further, it will also be relevant for the fact-finder to examine the extent to which Ms. Hawkins fought back against or resisted her husband's violence, both in general during these episodes, and on the night she killed him, prior to his passing out or falling asleep. *See Floyd v. Equitable Life Assurance Society,* 164 W.Va. 661, 264 S.E.2d 648 (1980) (reversing summary judgment in favor of insurer where wife had never before in thirty-one years retaliated against husband's abuse until night she fatally stabbed him); *Stevenson v. Reliable Life Insurance Co.,* 427 S.W.2d 945 (Tex.Civ.App.1968) (summary judgment for insurers upheld where husband deliberately took chance of being killed by advancing in a threatening manner towards the muzzle of a pointed pistol held by his wife, even after she had fired warning shots); *Howard v. Southern Life and Health Ins. Co.,* 474 So.2d 1109 (Ala.1985) (overturning summary judgment for insurer based on pri-

---

10. The fact-finder will be able to consider whether Mr. Hawkins voluntarily went to sleep and, not as the Insurers suggest, simply became unconscious due to intoxication. In addition, if the fact-finder determines that Mr. Hawkins reason-

ably should have expected to be killed, the fact-finder will be able to consider when he so expected, i.e. on the night he died, or at some unspecified time in the future.

or passivity of killer despite insured's assaults).

The Insurers present a portrait of Ms. Hawkins as a long-suffering battered wife who, as a result of Mr. Hawkins' repeated abuse and threats to kill her if she left him, was left with the choice of kill or be killed.[11] However, it is undisputed that, on at least some occasions, Ms. Hawkins apparently fought back. First, according to the affidavit of Ms. Lakisha Heggie, there were "several occasions of their [Mr. and Mrs. Hawkins] slapping or smacking each other." (Heggie Aff. at ¶ 11). Second, according to the affidavit of Ms. Channelle Butler, which is not specifically denied by Ms. Hawkins, sometime in 1991 or 1992, Ms. Hawkins pushed Mr. Hawkins down some stairs during an argument, causing him to hit his head on a radiator and start bleeding. (Butler Aff. at ¶ 10). In addition, during the fight between Mr. Hawkins and Ricks, "Ms. Hawkins grabbed Mr. Hawkins and told him to put the chair down and let [Ricks] leave." (Ricks Decl. at ¶ 5). The Estate argues this action "show[s] defiance and lack of intimidation rather than fear and helplessness." (Estate's Mem. of Law in Opp. to Mot. for Summ.J. at 31).

It is up to the fact-finder to determine what conduct Mr. Hawkins engaged in, whether said conduct was intentional, whether his conduct provoked retaliation by Ms. Hawkins, and whether a reasonable person, with similar background and characteristics of Mr. Hawkins, would have viewed death or serious injury as highly likely to occur.

## CONCLUSION

The record in this case, and the applicable case law causes this Court to conclude that reasonable minds could differ as to whether the death of Mr. Hawkins was "accidental." Therefore, the Court denies the pending Cross–Motions for Summary Judgment.

[11]. The parties debate as to whether Ms. Hawkins suffered from a psychological condition, such as Battered Spouse Syndrome. Ms. Hawkins's mental state would appear relevant in the context of what Mr. Hawkins knew of her mental condition, if any such condition did exist.