C. Russell **DANZ**, et. al, Plaintiffs

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA, et al., Defendants**

**No. CIV. AMD 01–1010.**

United States District Court, D. Maryland.

Aug. 13, 2002.

Alfred L. Scanlan, Jr., Eccleston and Wolf PC, Baltimore, MD, Frederic M. Brandes, Timonium, MD, for Plaintiffs.

Barrett W. Freedlander, Edward Joseph Baines, Saul Ewing LLP, Baltimore, MD, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVIS, District Judge.

C. Russell Danz and Charles E. Danz ("the plaintiffs") instituted this action against defendants Cigna Corporation and Life Insurance Company of North America ("LINA"), seeking recovery of the proceeds of two life insurance policies in consequence of the death of their father. Plaintiffs filed the case in the Circuit Court for Anne Arundel County, from which the case was timely removed by defendants to this court on the basis of both diversity and federal question jurisdiction. The claims against CIGNA have been dismissed by stipulation. A three-day bench trial commenced on December 17, 2001. Subsequently, the parties submitted post-trial briefs and proposed findings of fact.

Final arguments were scheduled for April 9, 2002. After plaintiffs presented their closing argument, and during defendant's closing argument, I became aware for the first time that, contrary to my then understanding, it was *not* agreed by the parties that the case arose under state law rather than under federal law. I thereupon suspended the proceedings and ordered the parties to conduct additional discovery in respect to the employee benefit plan of which the insurance policies were a part.

The supplemental discovery has concluded. Although I contemplated that further closing argument would be allowed, I now conclude that further argument is unneces-

sary. In particular, plaintiffs have been fully heard in argument. I have carefully considered the entire evidentiary record of the case, and I render herein findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). For the reasons set forth, judgment shall be entered by separate order in favor of defendants.

## Background

Many of the cardinal facts which underlie this case are largely undisputed. As discussed in detail herein, such disputes as are present are disputes of ultimate fact between the expert witnesses retained by the parties.

The action arises out of the death of Carl H. Danz ("Danz") on November 18, 1999. He was 54 years old. He is survived by two adult sons, plaintiffs C. Russell Danz and Charles E. Danz. At the time of his death, Danz was employed by Rhodia, Inc. ("Rhodia"), a manufacturer of chemicals used to make shampoo and similar compositions. As a part of his employee benefit plan, Danz enjoyed coverage under the accidental death insurance policies at issue and described below.

For over 30 years, Danz worked for Rhodia at its Fairfield facility in South Baltimore. Originally, Rhodia employed Danz at an entry level position; he loaded trucks and filled drums. Rhodia eventually promoted Danz to the position of truck driver. Danz delivered chemicals to customers throughout the United States. His responsibilities included securing the truck prior to departure, transporting the shipment safely to the customer's plant, and overseeing the unloading of the chemicals. Danz typically made deliveries to a plant in Connecticut. A typical workday for Danz would be to awake at 1:00 a.m., leave his house by 2:30 a.m., arrive at Rhodia's Baltimore facility by 3:00 a.m., and depart by 3:00 or 3:30 a.m. Danz would then arrive in Connecticut between 10 a.m. and 11:00 a.m. and the truck would be unloaded. Danz would depart Connecticut between 12:00 and 1:00 p.m. and would arrive in Baltimore at approximately 4:00 p.m. Danz typically made four or five of these runs every week.

## Danz's Medical History

In 1995, Danz suffered a heart attack. He underwent an angioplasty procedure later in 1995. For a period of unknown duration after the heart attack, it appears that Danz may have taken nitroglycerin tablets. After a recuperation period, Danz resumed his duties as a truck driver. Subsequent to the 1995 heart attack, a cardiologist monitored Danz regularly. Danz's heart showed evidence of chronic left ventricular hypertrophy—the thickening of the ventricular wall as a result of high blood pressure. He had chronic coronary heart disease but he did not experience any chest pain or any shortness of breath. No arrhythmia was diagnosed. On September 20, 1999, at the final medical examination before his death, Danz reported that he had no chest pain, no shortness of breath and was "doing good."

## The Insurance Policies

Danz was insured under the Group Accident Policy OK–822729. The face amount of the Group Accident Policy was $500,000. Danz also was insured under the Blanket Accident Policy ABL–664591. The face amount of the Blanket Accident Policy was also $500,000. Plaintiffs are joint beneficiaries under the policies.

The relevant portions of the Group Accident Policy OK–822729 provide:

THIS IS AN ACCIDENT POLICY WHICH DOES NOT PAY BENEFITS FOR LOSS FROM SICKNESS.

\* \* \* \* \* \*

We agree to pay benefits for loss from bodily injuries:

(a) caused by an accident which happens while an insured is covered by this policy; and

(b) which, directly and from no other causes, result in a covered loss.

We will not pay benefits if the loss was caused by:

(a) sickness, disease, or bodily infirmity; or

(b) any of the Exclusions listed. . . .

### EXCLUSIONS

No benefits will be paid for loss resulting from:

\* \* \* \* \* \*

6. sickness, disease, or bodily infirmity.

The relevant portions of the Blanket Accident Policy ABL–664591 provide:

THIS IS AN ACCIDENT ONLY POLICY. IT DOES NOT PAY BENEFITS FOR LOSS CAUSED BY SICKNESS

\* \* \* \* \* \*

Scope of Coverage—In exchange for the payment of premiums . . . , we agree to pay benefits to all eligible persons . . . :

1. who suffer injury to the body in any of types of accidents described in Schedule IV, which happens while he is covered by this policy; and

2. who, as a direct result of the injuries, and from no other cause, suffer a covered loss.

This coverage is subject to the exclusions set forth on page 6, and to all of the other terms of this policy. **This is an accident only policy. It does not pay benefits for loss caused by sickness. Read policy with care.** (Emphasis in original).

### The Accident and the Autopsy

On Wednesday, November 17, 1999, Danz departed Baltimore to make a delivery to a customer located in Minnesota.

He was expected to return on Friday, November 19, 1999. Tragically, Danz never made it to Minnesota.

On the day he departed for Minnesota, Danz worked at the Rhodia facility while his truck was being loaded and processed. C. Russell Danz saw his father that morning and observed that his father appeared to be in normal health. Tr. at 136. Driving an 18–wheel tractor-trailer, Danz departed for Minnesota at approximately 11:30 a.m. on November 17, 1999.

At 2:47 p.m. on Thursday, November 18, 1999, Danz was driving westbound on a curved portion of Interstate 94 in Eau Claire, Wisconsin, when his rig went off the road onto the right shoulder and struck the guardrail. The guardrail penetrated the truck from the left front of the tractor, above the hood diagonally and through the cab and out the right rear cab and sleeper and extended out of the cab approximately six feet. The truck then careened off the embankment and rolled over into a ditch, landing upside down.

An eyewitness observed the truck "start to slow down . . . [then it] pulled to the right and rolled over." There were no apparent mechanical defects in the tractor-trailer except for one brake, which was out of adjustment. Specifically, "the suspension and steering components of the tractor and trailer were intact and showed no defects."

At approximately 3:18 p.m., Wisconsin State Trooper Tom Walters ("Walters") arrived at the crash scene. Upon his arrival, Walters quickly learned that there had been a fatality; Danz's body was extricated from the cab of the truck. Walters reviewed Danz's business records and concluded that Danz had been driving for 19 hours since his last 8 hours off duty.\*

---

\* The state trooper's determination is disputed by LINA. LINA contends that Danz could not have been driving for nineteen hours as the distance between Eau Claire and Baltimore is 1018 miles (a 17 hour trip assuming speed of 60 mph). LINA contends that Danz was off

At approximately 3:50 p.m., Joseph Nezworski ("Nezworski"), a registered nurse at Sacred Heart Hospital and the Deputy Medical Examiner for Eau Claire County, examined Danz on a stretcher in an ambulance, noting primarily facial injuries. Nezworski ordered an autopsy to be performed and authorized Mark Hofer, M.D. ("Hofer"), a pathologist working at Sacred Heart Hospital, to perform the autopsy. Hofer performed the autopsy the following morning on November 19, 1999.

Upon external examination of Danz's body, Hofer reported the following observations: (1) "obvious evidence of trauma to the face with abundant blood dried"; (2) "a large deep 3 cm. long laceration is noted above the left eyebrow"; (3) "the maxilla is fractured and multiple teeth are disrupted"; (4) "abundant hemorrhage involving the eyes"; (5) "abrasions of the right upper and lower quadrant of the anterior aspect of the abdomen"; (6) "[s]mall abrasion is noted over the right upper buttock posteriorly"; (7) "abrasions are noted on the left arm laterally distal to the elbow"; and (8) "lower extremities show abrasion over the right knee that measures 4 cm. in length."

Upon internal examination of Danz's body, Hofer reported, *inter alia,* the following: (1) "abundant blood noted in the peritoneal cavity"; (2) "mild amount of blood in the left and right pleural cavities"; (3) "approximately 40 ml. of . . . blood in the pericardial sac"; (4) "obvious rupture of the superior vena cava above the atria with hemorrhage into the pericardial sac"; (5) nearly "transected liver with extensive lacerations to the liver"; (6) "abundant fresh hemorrhage noted in the trachea"; (7) "hemorrhagic fluid in the right and left mainstem bronchi"; (8) "there is mild to moderate fresh hemorrhage involving the perirenal fat bilaterally"; (9) "[t]he calvarium is reflected and there is mild fresh

hemorrhage noted anteriorly in the soft tissues overlying the frontal bone."

Dr. Hofer's examination of tissue samples of the myocardium revealed "moderate to severe coronary atherosclerosis." Sections of the right coronary artery revealed "fresh thrombus formation with marked atherosclerosis and complete occlusion of the lumen in the vessel" in the right coronary artery. Sections of "lung parenchyma revealed mild pulmonary congestion."

Based on the above, Dr. Hofer made the following pathological diagnosis: (1) "Severe atherosclerotic coronary artery disease with fresh thrombosis involving right coronary artery with complete occlusion of the right coronary artery by thrombus formation"; (2) "Evidence of old myocardial infarction involving posterior, inferior, lateral, and septa areas of the left ventricle"; (3) "Transection of the superior vena cava with mild hemorrhagic pericardial effusion"; (4) "Multiple lacerations of liver with nearly complete transection of liver with mild hemoperitoneum"; (5) "Extensive hemorrhage involving perirenal fat pads of right and left kidneys."

Dr. Hofer made the following written comments:

Significant autopsy findings show cardiac evidence of probable acute myocardial infarction with evidence of multiple old myocardial infarctions. The right coronary artery shows severe atherosclerosis with thrombus formation. Other significant findings at autopsy include transection of the liver with hemorrhagic pleural effusions and hemorrhagic fluid noted in the peritoneal cavity.

Nezworski subsequently determined the cause of death to be acute myocardial infarction and complete occlusion of the right coronary artery with thrombosis.

duty in Howe, Indiana from 12:01 a.m. to 8:00 a.m.

Nezworski concluded the manner of death to be natural.

**Denial of the Claim**

On February 18, 2000, plaintiffs submitted an amended application to LINA for benefits under the policies; LINA subsequently reviewed and denied the claim, concluding that Danz did not die of accidental causes but from a myocardial infarction arising from his severe atherosclerosis and subsequent thrombus formation. LINA informed plaintiffs of their right to request that LINA review its decision to deny the claim and indicated that the review would be completed no later than 120 days from the request for review. On May 12, 2000, plaintiffs requested LINA to review its denial. When plaintiffs did not receive a final determination after a time, they filed this lawsuit.

**Choice of Law**

The parties agree that the claims in this case arise under the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1001 *et seq.*, ("ERISA") and not state law. Typically, decisions by administrators of ERISA plans are subject to de novo review by the courts. *Bynum v. Cigna Healthcare of North Carolina, Inc.*, 287 F.3d 305, 311 (4th Cir.2002) (citing *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). If, however, the ERISA plan provides the plan administrator with discretionary authority to interpret the terms of the plan and to make coverage determinations, the administrator's decisions are reviewed by the courts only for abuse of discretion. *Id.* Neither party contends that the benefit plan involved here gives the administrator discretionary authority to determine benefit eligibility or to construe the plan terms. Accordingly, the standard of review in this court will be de novo.

■ Generally, the court's de novo review is limited to the evidence previously presented to and considered by the plan administrator. *Quesinberry v. Life Ins. Co. of N. America*, 987 F.2d 1017, 1026–27 (4th Cir.1993) (en banc). Exceptional circumstances, however, may warrant an exercise of the court's discretion to allow addition evidence. *Id.* Such circumstances include the following:

claims that require consideration of complex medical questions or issues regarding the credibility of medical experts; the availability of very limited administrative review procedures with little or no evidentiary record; the necessity of evidence regarding interpretation of the terms of the plan rather than specific historical facts; instances where the payor and the administrator are the same entity and the court is concerned about impartiality; claims which would have been insurance contract claims prior to ERISA; and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process.

*Id.* at 1027. As the present lawsuit was filed before a final determination by the plan administrator was made, there is no administrative record to review. Consequently, I have considered all the documentary and testimonial evidence admitted at trial.

**Analysis of the Merits**

A

■ Under the federal common law of ERISA, the burden of proving that death was a result of accidental injuries rests upon the claimant. *Lincoln Nat. Life Ins. Co. v. Evans*, 943 F.Supp. 564, 567 (D.Md. 1996) (citing *Motley v. Metropolitan Life Ins. Co.*, 834 F.Supp. 1272, 1276 (D.Kan. 1993)). Such an allocation of the burden of proof is consistent with non-ERISA, diversity insurance contract cases. *See Choice Hotels, Inc. v. Madison Three, Inc.*, 83 F.Supp.2d 602, 603 (D.Md.2000) (citing

*Kruvant v. Dickerman,* 18 Md.App. 1, 305 A.2d 227, 229 (1973), as "noting that Maryland follows the general rule that 'in either breach of contract or tort cases ..., the burden of proof is on the ... party who asserts the affirmative of an issue, and that burden never shifts' ").

■ The Fourth Circuit has held that when policy language limits coverage to losses caused by accidents "directly and independently of all other causes," the existence of a preexisting condition which contributes to the loss does not bar recovery under an ERISA policy unless the preexisting condition "*substantially* contributed to the disability or loss." *Adkins v. Reliance Standard Life Ins. Co.,* 917 F.2d 794, 795, 797 (4th Cir.1990) (quotations omitted) (emphasis added). The Court specifically disapproved of *Ques-Tech, Inc. v. Hartford Acc. and Indem. Co.,* 713 F.Supp. 956 (E.D.Va.1989), for applying a strict, literal interpretation of policy language, "directly and independent," and interpreting such language to mean "solely as a result of accidental means." ** *Id.* at 796. The Fourth Circuit, declining to apply a strict interpretation of the policy language, reasoned that literal application of such policy language would nullify the benefits an insured could expect from a policy in a large number of instances. "[W]ith such a stringent construction, a claimant would have to be in perfect health at the time of his most recent injury before the policy would benefit him ...." *Id.* Thus, the Court adopted the following approach, which it borrowed from *Colonial Life & Acc. Ins. Co. v. Weartz,* 636 S.W.2d 891, 894 (Ky.Ct.App. 1982):

[A] pre-existing infirmity or disease is not be considered as a cause unless it

substantially contributed to the disability of loss.... [A] 'predisposition' or 'susceptibility' to injury, whether it results from congenital weakness or from previous illness or injury, does not necessarily amount to a substantial contributing cause. A mere 'relationship' of undetermined degree is not enough.

*Reliance Standard,* 917 F.2d 794, 797.

Applying and elaborating upon the reasoning in *Reliance Standard,* the Fourth Circuit in *Quesinberry v. Life Ins. Co. of N. America,* 987 F.2d 1017 (4th Cir.1993) (en banc), crafted the following two-step test to determine whether the decedent's death was covered by the accidental death policy:

[F]irst, whether there is a pre-existing disease, disposition, or susceptibility to injuries; and second, whether this pre-existing condition, pre-disposition, or susceptibility substantially contributed to the disability or loss.

*Id.* at 1028. In *Quesinberry,* the decedent suffered a toxic reaction to a drug administered for diagnostic purposes. Within three days she was dead. The policy language required that the injury result "directly and independently of all other causes." *Id.* at 1027. The beneficiary under the accidental death insurance policy brought suit challenging the denial of his claim, asserting that his wife had suffered an accidental death as a result of a toxic reaction to the drug. The insurance company had denied the claim based on the assertion that a preexisting condition caused the decedent's toxic reaction to the drug. *Id.* at 1020. The Fourth Circuit, affirming the judgment, held that the decedent's death was covered by the accidental policy, as the district court did not find

---

** It is to be noted that the policies at issue in this case include a requirement that a covered loss be "caused by an accident ... and from no other causes." As discussed in text, the

Fourth Circuit teaches that such language is not to be given a literal meaning in an insurance policy covered by ERISA.

that the preexisting condition "substantially contributed" to the loss; rather, the lower court had found a "mere relationship of undetermined degree" between the decedent's preexisting condition and the lethal toxic reaction. *Id.* at 1028.***

In the case at bar, both accidental death policies require that a loss result "directly and from no other causes" for the loss to be covered. Accordingly, the standard adopted in *Quesinberry* applies. Plaintiffs have the burden of proving that Danz's preexisting cardiac condition did not substantially contribute to his death. *See, e.g., Criss v. Hartford Accident and Indemnity Co.*, 1991 WL 640066, at *9 ( E.D.Mich. Aug.26, 1991) (applying the *Reliance Standard* test and explaining that the burden rests on plaintiff to show that the preexisting condition did not substantially contribute to the death); *Evans,* 943 F.Supp. at 567.

### B

■ Plaintiffs contend that the sole cause of Danz's death was his traumatic injuries suffered in the accident. LINA concedes, as it must, that the traumatic bodily injuries Danz suffered in the accident *would have sufficed* to kill him, but it asserts, to the contrary, that the sole cause of death was sudden cardiac arrest, i.e., that Danz suffered sudden cardiac arrest while driving, and as a consequence he lost control of his vehicle, veered off the road, and expired. Of course, plaintiffs need not prove the existence of a *sole* cause; rather, plaintiffs need only establish by a preponderance of the evidence that Danz's preexisting cardiac condition did not "substantially contribute" to Danz's death. *Quesinberry, supra.* The

record reveals that plaintiffs have not met their burden. I explain.

At trial, LINA called Dr. Bruce Goldman. Dr. Goldman is a specialist in autopsy pathology, cardiovascular pathology and transplant pathology. Dr. Goldman is board certified in anatomic and clinical pathology and passed the forensic pathology part of the Anatomic Pathology Boards. Currently, Dr. Goldman is the Director of Autopsy Services at Temple University Hospital in Philadelphia. Dr. Goldman is responsible for interpreting the cardiac pathology from patients undergoing heart transplants at Temple, which includes the diseased hearts that are retrieved from transplant recipients. In his capacity as Director of Autopsy Services, Dr. Goldman reviews all of the autopsies performed at Temple, approximately 100–120 autopsies a year. In each instance, he determines the cause of death, particularly, "whether someone died as a result of a cardiac event as opposed to something else." *Tr.* 264.

Dr. Goldman testified that after receiving microscopic slides and the autopsy report, he came to the following conclusion to a reasonable degree of medical certainty:

> Mr. Danz died of what is termed "sudden cardiac death" as the result of a plaque rupture and mural thrombus in the right coronary artery, likely due to embolization of thrombic material into the intramural coronary arteries.

*Tr.* 272. Dr. Goldman explained that Danz's medical history predisposed him to sudden cardiac death. Specifically, Danz had a history of unstable angina, for which he had undergone an angioplasty with stint

---

*** There can be little doubt that the phrasing of the applicable test can drive the outcome of disputes of the sort presented here. *See Henry v. Home Ins. Co.,* 907 F.Supp. 1392, 1398 (C.D.Cal.1995)("The focus of an analysis under the predominant cause test is on the effect the accident had on the insured. The Fourth Circuit's substantial factor test, by contrast, focuses on the effect the insured's health had on the accident.")(rejecting the *Reliance Standard* test).

placement in the left anterior descending artery, *Tr.* 274; (2) he was obese, *id.;* (3) he had high cholesterol *id.;* (4) he was a cigarette smoker, *id.;* and, (5) he had severe coronary arteriosclerosis as evidenced by a "pinpoint lumen." *Tr.* 300.

Dr. Goldman quickly rejected as untenable the cause of death originally proffered by plaintiffs' expert, Dr. Thomas Coughlin. In his initial report, Dr. Coughlin had opined that the cause of death was hemorrhagic shock. Dr. Goldman dismissed this mechanism as the cause of death, explaining that there was insufficient blood to account for death by hemorrhagic shock. Specifically, Dr. Goldman testified that the 40 ml. of blood in the pericardial sac from the transected superior vena cava is simply too little. Further critiquing this theory of causation, Dr. Goldman noted the autopsy report, which described blood in the abdominal/peritoneal cavity as "mild hemoperitoneum[; hemoperitoneum means blood in the peritoneal cavity.]" Indeed, Dr. Coughlin admitted that he no longer supported his original opinion that the cause of death was due to hemorrhagic shock. *Tr.* 97–99.

Dr. Goldman meticulously explained this lack of bleeding or exsanguination, despite the damage to the superior vena cava and the liver. Dr. Goldman testified to a reasonable degree of medical probability that Danz suffered sudden cardiac death while driving and that he was clinically dead at the time of impact such that blood was not circulating. According to Dr. Goldman, an extensive laceration of the liver "would be expected to produce a massive hemoperitoneum in someone whose heart was active at the time of the trauma." *Tr.* 275. Dr. Goldman elaborated that had blood been flowing at the time of trauma, the pericardial sac would have filled in seconds and should have contained approximately 100–200 milliliters of blood.

Relying on two pieces of evidence, Dr. Goldman detailed how he reached his conclusion that Danz suffered sudden cardiac death. First, Dr. Goldman cited the presence of a thrombus, which he defined as "a solidification of blood which is caused by the activation of enzymes in the blood that cause proteins to stick to each other and form a solid mass that traps cells." *Tr.* 277. Dr. Goldman described how a thrombus creates a "coronary occlusion [which] causes the heart to beat irregularly . . . ." *Tr.* 278. According to Dr. Goldman, any form of occlusion is sufficient to create this irregular beat since "a relative loss of blood flow to any parts of the heart, . . . can either cause it to beat more weakly or beat irregularly, and that can cause heart failure." *Tr.* 278. In essence, "[c]oronary thrombi can cause sudden death by causing dysrhythmia and ventricular fibrillation." *Id.*

Dr. Goldman further discussed the mechanism in which a thrombus can cause ventricular fibrillation and the consequent sudden cardiac death. *Tr.* 281–283. When a thrombus first forms it is fragile and "prone to breaking off or embolizing—that is, the breaking off into the blood stream and going downstream [in the direction of the heart]." *Tr.* 285. The pieces that break off then go in the direction of the blood flow downstream in the artery and may cause the induction of ventricular fibrillation. *Id.* Apparently, the ventricular fibrillation is the result of the smaller pieces flowing into the smaller coronary arteries and causing a "localized ischemia, which is known to induce ventricular fibrillation." *Id.*

Dr. Goldman pointed to a high powered microphotograph of a slide, *Def.'s* Ex. 6, and indicated the presence of a piece of thrombus in the smaller coronary artery. Dr. Goldman testified that this was "direct evidence that there was embolization of

the non-occlusive thrombus into the myocardium" *Tr.* 287.-88.

Dr. Goldman discussed the second piece of evidence upon which his conclusion is based—the presence of pulmonary edema. Pulmonary edema means that the left ventricle is not removing blood that has returned to it. Dr. Goldman pointed to another photomicrograph, and he explained that pulmonary edema could be detected by pink material inside the linings of the air spaces. *Tr.* 293. Dr. Goldman also noted that the lung weight of 800 grams, which is heavier than normal, indicated pulmonary edema. *Id.*

Plaintiffs' experts do not dispute the presence of pulmonary edema. *Tr.* 177. Moreover, plaintiffs' experts fail to rebut Dr. Goldman's conclusions regarding the presence of the thrombus. In addition to the testimony of Dr. Coughlin, plaintiffs presented the testimony of Dr. John Adams, who is board certified in anatomic, clinical and forensic pathology. Dr. Adams is no longer a practicing physician; rather, for the past 11 years he has engaged in a consultation practice on forensic pathology issues. *Tr.* 149.

At the outset, Dr. Adams acknowledged that the mechanism and cause of death described by Dr. Goldman are possible that the fragmenting of a thrombus could lead to "electrical pulses of the heart." *Tr.* 173. Dr. Adams saw no evidence of thrombus breakage, however. Dr. Adams provided scant detail for his determination that there was no evidence of thrombus breakage. Moreover, I am constrained to give little credence to Dr. Adams's determination given Dr. Goldman's detailed analysis of the microscopic slides, in view if his sub-specialty in cardiac pathology. Although Dr. Adams is a pathologist, he is not a cardiac pathologist. *Id.*

Dr. Adams testified that the presence of blood around the kidneys, which represents blood pressure at the time of impact,

undermines Dr. Goldman's hypothesis. *Id.* 191. Dr. Adams also cited the following excerpts from the autopsy as evidence of the presence of blood in various areas of the body and thus as evidence that Danz was alive at the time of impact: (1) "abundant blood dried on the face"; (2) "abundant hemorrhage involving the eyes"; (3) "abundant blood noted in the peritoneal cavity"; (4) "abundant fresh hemorrhage noted in the trachea;" "hemorrhage into the pericardial sac"; (5) "[e]xtensive hemorrhage involving perirenal fat"; (6) "rigid and left mainstem bronchi show hemorrhagic fluid"; (6) "mild amount of blood noted in the right and left pleura; cavities"; and (7) "calvarium is reflected and there is mild fresh hemorrhage."

Plaintiffs understandably attempted to establish, through this evidence, that Danz's heart was fully functional at the time of the impact of the truck with the guardrail. This attempt fails. Plaintiffs offer no evidence that at the moment the heart stops beating, blood will not flow or "ooze" out of the body if the skin is lacerated. *Tr.* 322–23. Moreover, Dr. Goldman explained that the blood on Danz's face could have been the result of basic forces of gravity. *Id.* Likewise, plaintiffs' other expert, Dr. Coughlin, failed to discredit Dr. Goldman's opinion as Dr. Coughlin failed to review the microscopic slides on which the entirety of Dr. Goldman's testimony was based. *Tr.* 72, 84, 85, 99. Moreover, Dr. Coughlin is not a pathologist; rather he was trained as a cardiothoracic surgeon and, like plaintiffs' other expert, is no longer a practicing physician. *Tr.* 57.

Failing to address Dr. Goldman's conclusions, Dr. Coughlin testified that the cause of death was a cardiac concussion, which caused the heart to stop beating immediately or seconds after the impact. *Tr.* 66–69; 101–102. Dr. Coughlin noted that the

injuries sustained by Danz—the multiple facial fractures, fractured ribs, torn superior vena cava, and multiple lacerations to his liver—clearly establish the severity and force of the impact. *Id.* Dr. Coughlin explained that the presence of a torn superior vena cava is a highly unusual injury in this type of accident and explained that this specific injury evidenced the severity of the trauma. As further evidence of the severity of the impact, Dr. Coughlin noted the nearly transected liver. (Dr. Adams testified in a similar fashion, explaining that the cause of death was crushing blunt-force, which could cause the heart to stop.) Dr. Coughlin's testimony, however, does little to weaken the conclusion reached by Dr. Goldman. Evidence regarding the severity of the force of impact does not aid plaintiffs in meeting their burden—that Danz's heart condition, specifically the thrombus formation, did not substantially contribute to his death.

Even if I were to view the testimony by the experts to be in equipoise, which I do not given the cogency of Dr. Goldman's hypotheses, the clarity with which he explained those hypotheses, and his unimpeached credentials and experience, plaintiffs would have failed to carry their burden. Moreover, in a sense, plaintiffs started off with an extra burden in that, throughout their case, they have been unable to address with admissible evidence the manner in which the accident occurred. That the vehicle left the road in a manner typical of a driver suffering some type of affliction cannot be ignored. The accident occurred at approximately 2:47 p.m. and the roads were clear. An eyewitness driving behind Danz stated that he "saw [Danz] start to slow down ... he pulled to the right and rolled over." There were no mechanical defects in the tractor-trailer. Nor is there any evidence of any obstruction in the road. The absence of any evidence that would suggest why the vehicle left the road but-

tresses Dr. Goldman's conclusion that the insured suffered sudden cardiac death prior to the collision. In the instant case, given the presence of a thrombus, Danz's medical history, the road conditions, and the time of day, the inferences to be drawn from the manner in which the vehicle left the road must be taken into account.

In sum, plaintiffs have failed to prove by a preponderance of the evidence that Danz's heart condition did not substantially contribute to his death.

**Conclusion**

For the foregoing reasons, judgment shall be entered in favor of defendants.

## ORDER

For the reasons stated in the foregoing Findings of Fact and Conclusions of Law, it is this 13th day of August, 2002, by the United States District Court for the District of Maryland, ORDERED

(1) That JUDGMENT BE AND HEREBY IS ENTERED IN FAVOR OF DEFENDANTS AGAINST PLAINTIFFS; and it is further ORDERED

(2) That the Clerk of the Court shall CLOSE this case and TRANSMIT a copy of this Order the foregoing findings and conclusions to counsel of record.